UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STONEBRIDGE OF GURNEE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 20 C 6714 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Stonebridge of Gurnee, LLC seeks judicial review under 7 U.S.C. § 2023(a) of the Food and Nutrition Service's ("FNS") denial of its application to participate in the Supplemental Nutrition Assistance Program ("SNAP") as an authorized meal service provider. Doc. 1. The United States moves to dismiss or for summary judgment, Doc. 9, and Stonebridge moves under Rule 56(d) to defer consideration of that motion so that it may take discovery, Doc. 21. Stonebridge also moves for a preliminary injunction requiring FNS to authorize it as a SNAP meal service provider. Doc. 19. Stonebridge's Rule 56(d) motion is granted in part and denied in part, the United States's motion to dismiss or for summary judgment is denied, and Stonebridge's motion for a preliminary injunction is denied.

**Background**

A.  **Statutory and Regulatory Background**

SNAP, a program of the Food and Nutrition Act of 2008 ("FNA"), "permit[s] low-income households to obtain a more nutritious diet … by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. The FNA authorizes the Secretary of Agriculture to administer SNAP and promulgate regulations that are "necessary or

1

appropriate for the effective and efficient administration of" the program.  *Id*. § 2013(a), (c).  The regulations delegate to FNS, a component of the Department of Agriculture, the authority to administer SNAP.  *See* 7 C.F.R. §§ 2.57(a)(1)(i), 271.3(a).  And the FNA itself delegates to the State of Illinois the responsibility for certifying "households" eligible to receive SNAP benefits in Illinois.  7 U.S.C. § 2020(a)(1).

Only "eligible households" may participate in SNAP, and they may use their monthly benefits only to purchase "food" from "retail food stores."  *Id*. §§ 2013(a), 2016(b).  As the United States observes, with Stonebridge's concurrence, the term "retail food stores" includes not just traditional supermarkets or grocery stores, but also "meal service providers," a subset of which are "senior meal providers."  Doc. 10 at 2; *see* Doc. 1 at ¶¶ 12-19; Doc. 16 at 8.  Specifically, the FNA defines "food" to include "meals prepared by and served in senior citizens' centers[] [and] apartment buildings occupied primarily by" "persons who are sixty years of age or over or who receive supplemental security income benefits or disability or blindness payments," 7 U.S.C. § 2012(k)(3), and it defines "retail food store" to include such senior citizens' centers and apartment buildings, *id*. § 2012(o)(2).

As a general rule, a "household" eligible to receive SNAP benefits is "an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from the others," or "a group of individuals who live together and customarily purchase food and prepare meals together for home consumption."  *Id*. § 2012(m)(1)(A)-(B).  The FNA provides, however, that a resident of an "institution" is not an eligible "household," *id*. § 2012(m)(4), except for five categories of persons who "shall not be considered to be residents of institutions and shall be considered to be individual households," *id*. § 2012(m)(5).

2

The "Household concept" regulation, 7 C.F.R. § 273.1, implements the statutory requirements for being a "household" eligible to receive SNAP benefits. Pertinent here, § 273.1(b)(7)(vi) states that "residents of an institution" who do not fall within any of five exceptions—which roughly correspond with the exceptions set forth in 7 U.S.C. § 2012(m)(5)— are "ineligible household members." 7 C.F.R. § 273.1(b)(7)(vi). Section 273.1(b)(7)(vi) further provides that "[i]ndividuals must be considered residents of an institution when the institution provides them with the majority of their meals (over 50 percent of three meals daily) as part of the institution's normal services." *Ibid*.

The "Approval of retail food stores and wholesale food concerns" regulation, 7 C.F.R. § 278.1, implements the statutory requirements for being a "retail food store" eligible to provide SNAP benefits. Section 278.1(a) requires "[a]ny firm desiring to participate or continue to be authorized in [SNAP to] file an application as prescribed by FNS." *Id*. § 278.1(a). Section 278.1(b) requires an application to include "sufficient data and information on the nature and scope of the firm's business for FNS to determine whether the applicant's participation will further the purposes of the program." *Id*. § 278.1(b). And § 278.1(d) sets forth requirements for entities seeking to qualify as meal service providers under 7 U.S.C. §2012(k)(3):

> *Meal services.* A meal delivery service or communal dining facility desiring to prepare and serve meals to households eligible to use coupons for those meals in addition to meeting the requirements of paragraphs (a) and (b) of this section, must establish that:
>
> (1) … ; or
>
> (2) It is a senior citizens' center or apartment building occupied primarily by elderly persons and SSI recipients, and their spouses; or
>
> (3) … .

*Id*. § 278.1(d).

If FNS denies an application for SNAP authorization, the applicant may seek administrative review. *See* 7 U.S.C. §§ 2018(d), 2023(a)(1)-(5). If the administrative review officer affirms the denial, the applicant may seek judicial review. *See id*. § 2023(a)(13).

The Agriculture Improvement Act of 2018, Pub. L. No. 115-334 ("2018 Farm Bill"), amends the FNA to provide, among other things, that the Secretary of Agriculture "shall review a representative sample of currently authorized facilities referred to in section 2012(k)(3) of this title"—as noted, the senior meal providers that qualify as retail food stores—"to determine whether benefits are properly used by or on behalf of participating households residing in such facilities … ." 7 U.S.C. § 2018(i)(1)(A). The 2018 Farm Bill further provides that the Secretary "shall gather information, and such facilities, programs, and arrangements shall be required to submit information deemed necessary for a full and thorough review," and "shall report the results of [that] review," along with recommendations regarding "whether such facilities … should continue to be authorized to participate" in SNAP, to Congress. *Id*. §§ 2018(i)(1)(C), (D). And the 2018 Farm Bill includes what the parties call the "Limitation" provision:

> Nothing in this subsection shall authorize the Secretary to deny any application for continued authorization, any application for authorization, or any request to withdraw the authorization of any such facility, program, or arrangement based on a determination that residents of any such facility or entity are residents of an institution prior to December 31, 2021.

*Id*. § 2018(i)(2).

### B. Preliminary Factual Findings

In March 2018, Stonebridge began operating a supportive living program community ("SLP") in Illinois for low-income elderly persons and persons with disabilities. Doc. 19-2 at ¶¶ 3-4, 6. Stonebridge's facility is licensed by the Illinois Department of Healthcare and Family Services. *Id*. at ¶ 3. As of April 2021, "[n]early all" of Stonebridge's 110 residents received Medicaid and SNAP benefits or had pending Medicaid and SNAP applications. *Id*. at ¶ 6.

On January 24, 2019, Stonebridge applied to FNS to participate in SNAP as a meal service provider. Doc. 11-1. FNS denied the application on March 13, 2020. Doc. 19-6. In denying the application, FNS explained that, "[u]nder [7 C.F.R. §] 273.1(b)(7)(vi), firms that provide residents a majority of their meals (over 50 percent of three meals daily) are generally considered institutions and are, therefore, ineligible for authorization under [7 C.F.R. §§] 278.1(b)(1)(iv), 278.1(d), and 278[.]1(k)(1)." *Id*. at 1. FNS found that Stonebridge is one such institution, reasoning that "Illinois State law requires meal service providers such as [Stonebridge] to provide residents three meals per day (or two meals per day and a breakfast bar)." *Ibid*. FNS added that the 2018 Farm Bill's Limitation provision, "which restricts FNS'[s] actions regarding" certain facilities, does not apply to Stonebridge's facility. *Ibid*.

Stonebridge sought administrative review on March 20, 2020. Doc. 19-7 at 1. It argued that: (1) it "is an eligible meal service provider" and therefore "cannot be denied under 7 CFR § 273.1(b)(7)(vi)"; (2) the 2018 Farm Bill's Limitation provision "precludes [Stonebridge] from being denied"; and (3) "[a]nother firm [similarly situated to Stonebridge] was approved as a meal service provider." *Id*. at 4-5. On October 13, 2020, FNS issued its Final Agency Decision affirming the denial of Stonebridge's application. *Id*. at 2-5. In so doing, FNS reiterated the two reasons articulated in its denial letter: (1) that Stonebridge was an "institution" under 7 C.F.R. § 273.1(b)(7)(vi) and was therefore ineligible to be a meal service provider; and (2) that the 2018 Farm Bill's Limitation provision did not apply to Stonebridge. *Id*. at 4-5. FNS added that Stonebridge's contention regarding the other firm approved as a meal service provider was irrelevant because "[t]h[e] administrative review is limited solely to those circumstances concerning [Stonebridge's] eligibility." *Id*. at 5.

5

### C. This Lawsuit

Stonebridge filed this lawsuit on November 12, 2020. Doc. 1. The complaint alleges that FNS wrongly determined that Stonebridge is an "institution" ineligible for SNAP authorization as a meal service provider, and that FNS erred in concluding that it could not benefit from the 2018 Farm Bill's Limitation provision. *Id*. at ¶¶ 51-73. The complaint further alleges that "FNS acted arbitrarily and capriciously in denying Stonebridge's application for SNAP authorization while, at the same time, determining that at least two other Illinois SLPs are eligible for SNAP authorization, despite possession of evidence that both SLPs serve a majority of meals to their residents." *Id*. at ¶ 67.

Absent any request by Stonebridge to expedite the litigation, the court issued a standard order setting an initial status hearing for January 13, 2021 and requiring an initial status report by January 6, 2021. Doc. 3. It was Stonebridge's responsibility to arrange for a summons to be issued. *See* Fed. R. Civ. P. 4(b) ("On or after filing the complaint, the plaintiff may present a summons to the clerk for signature and seal."); Advisory Committee Note to Civil Rule 4 (1993) ("The revised text [of Rule 4(b)] makes clear that the responsibility for filling in the summons falls on the plaintiff, not the clerk of the court."). Stonebridge did not fulfill that responsibility until December 14, 2020, more than a month after it filed suit. Doc. 5 at ¶ 2. The United States was not served until January 5, 2021, nearly two months after suit was filed. Doc. 4. The United States had sixty days from that date to file a responsive pleading, *see* Fed. R. Civ. P. 12(a)(2), though it appeared through counsel on January 13, Doc. 8.

On January 6, Stonebridge informed the court that "it will likely file a motion for preliminary injunctive relief in the near future." Doc. 5 at ¶ 7. Despite that statement, and although no rule prohibited Stonebridge from moving for a preliminary injunction before the

responsive pleading deadline, Stonebridge did not file its preliminary injunction motion until April 24, over three months after the United States appeared, nearly four months after it said it would move for preliminary injunctive relief "in the near future," and over five months after it filed suit. Doc. 19. The preliminary injunction motion asks this court to "[d]irect[] the United States and its agency, FNS, to authorize Stonebridge as a SNAP-authorized meal service provider during the pendency of this action." *Id*. at 1. To support its motion, Stonebridge filed a declaration from its executive director stating in pertinent part that it "*may* need to cease operations" "[i]n the event that [it] does not receive its SNAP authorization in the near future." Doc. 19-2 at ¶ 13 (emphasis added). In the meantime, on March 8, the United States timely filed a responsive pleading, moving to dismiss or alternatively for summary judgment. Doc. 9.

## Discussion

### I. Stonebridge's Preliminary Injunction Motion

"To merit [a preliminary injunction], a movant must make a threshold showing that: (1) absent preliminary injunctive relief, [it] will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) [it] has a reasonable likelihood of success on the merits." *Tully v. Okeson*, 977 F.3d 608, 612-13 (7th Cir. 2020) (internal quotation marks omitted). "[I]f the movant makes this threshold showing, the court proceeds to consider the balance of harms between the parties and the effect of granting or denying a preliminary injunction on the public interest." *Id*. at 613 (internal quotation marks omitted). "In so doing, the court employs a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more need [the balance must] weigh in [its] favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (alteration and internal quotation marks omitted). "The sliding scale approach is not

mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 678 (7th Cir. 2012) (internal quotation marks omitted). "Stated another way, the district court sits as would a chancellor in equity and weighs all the factors, seeking at all times to minimize the costs of being mistaken." *Ibid.* (alteration and internal quotation marks omitted).

As noted, Stonebridge seeks a preliminary injunction directing FNS to authorize it as a SNAP meal service provider. The relief sought is mandatory rather than prohibitory, as it would "requir[e] an affirmative act" by the United States that would alter the status quo. *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). In evaluating Stonebridge's motion, the court therefore must bear in mind the Seventh Circuit's admonishment that "[m]andatory preliminary injunctions … are 'ordinarily cautiously viewed and sparingly issued.'" *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quoting *Graham*, 130 F.3d at 295); *see also Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944-45 (7th Cir. 2006) (noting that preliminary injunctions ordinarily are granted to "preserve the status quo," and that the movant ordinarily "is not given any rights, even temporarily, that would normally be his only if the legal dispute were resolved in his favor") (internal quotation marks omitted).

### A. Likelihood of Success on the Merits

Under governing precedent, "an applicant for preliminary [injunctive] relief bears a significant burden" to show a likelihood of success on the merits. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020). Neither a "possibility of success" nor a "better than negligible" chance of success is enough; rather, a movant "must make a strong showing that [it] is likely to succeed on the merits." *Id.* at 762; *see also id.* at 763 ("We note this to remind

both the district courts and ourselves that the 'better than negligible' standard [that appears in earlier opinions] was retired by the Supreme Court [in *Winter v. NRDC*, 555 U.S. 7 (2008)]."). "A 'strong' showing … does not mean proof by a preponderance … . But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Tully*, 977 F.3d at 613 (quoting *Ill. Republican Party*, 973 F.3d at 762-63).

Stonebridge makes two principal arguments as to why it is likely to succeed on the merits: (1) FNS wrongly denied its SNAP application on the ground that it is an ineligible "institution" under 7 C.F.R. § 273.1(b)(7)(vi); and (2) the denial violated the 2018 Farm Bill's Limitation provision. On the present record, neither argument persuades.

### 1. Whether Stonebridge Is an Ineligible "Institution"

Stonebridge contends that FNS's finding that it is an "institution" under 7 C.F.R. § 273.1(b)(7)(vi), and therefore not an eligible meal service provider, is wrong for three reasons.

*First*, Stonebridge argues that it is not an "institution" because its residents reside there voluntarily, not involuntarily. Doc. 19-1 at 9, 13 n.14. The FNA provides that persons who reside in an "institution" are not, with certain exceptions inapplicable here, eligible households, 7 U.S.C. § 2012(m)(4)-(5), but it does not define the term "institution." The implementing regulations fill that gap, stating that, with certain exceptions again inapplicable here, an "institution" is a facility that provides its residents "with the majority of their meals (over 50 percent of three meals daily) as part of the institution's normal services." 7 C.F.R. § 273.1(b)(7)(vi). Citing an online dictionary, Stonebridge contends that the regulation's definition of "institution" is faulty because the term's "most applicable definition" is a "facility or establishment in which people (such as the sick or needy) live and receive care typically in a confined setting and often without individual consent." Doc. 19-1 at 13 n.14 (citing *Institution*,

Merriam-Webster Dictionary Online (def. 1b), https://www.merriam-webster.com/dictionary/institution). Because Stonebridge buried that argument in a footnote, it is forfeited. *See Cross v. United States*, 892 F.3d 288, 294 (7th Cir. 2018) (holding that a party forfeited an issue by raising it only "succinctly in a footnote" in the district court) (internal quotation marks omitted).

Forfeiture aside, Stonebridge is wrong to contend that the term "institution" in 7 U.S.C. § 2012(m)(4) is limited to facilities where residents are involuntarily confined. The reason is plain: the exceptions to § 2012(m)(4) that Congress carved out in § 2012(m)(5) involve facilities in which persons voluntarily choose to reside. *See* 7 U.S.C. § 2012(m)(5) ("[r]esidents of federally subsidized housing for the elderly, disabled or blind," elderly or disabled residents of "nonprofit group living arrangement[s] that serve[] no more than sixteen residents," "[t]emporary residents of public or private nonprofit shelters for battered women and children," residents of nonprofit homeless shelters, and residents of drug or alcohol treatment facilities). There would have been no reason for Congress to carve out those exceptions if § 2012(m)(4) applied only to facilities where persons were involuntarily confined. *See Ark. Best Corp. v. Comm'r*, 485 U.S. 212, 218 (1988) ("Without any express direction from Congress, we are unwilling to read [a statutory provision] in a manner that makes surplusage of the[] statutory exclusions [to the provision at issue].").

*Second*, Stonebridge contends that, even assuming it is an "institution" under 7 C.F.R. § 273.1(b)(7)(vi), FNS improperly relied on that regulation because it governs the SNAP authorization of "households" and not of meal service providers. Doc. 19-1 at 7-10; Doc. 27 at 4-5. That argument fails as well. True enough, the exclusion of "residents of an institution" from SNAP eligibility appears in § 273.1, which governs certification of "households," and not

10

in § 278.1, which governs "[a]pproval of retail food stores" (of which meal service providers are a subset). But §§ 273.1 and 278.1 are inexorably intertwined. In setting forth the requirements for "meal service" providers, § 278.1(d) states that "[a] meal delivery service or communal dining facility *desiring to prepare and serve meals to households eligible to use coupons for those meals*" must show that it satisfies subsections (a) and (b) and that it fulfills one of three alternative criteria, including that it "is a senior citizens' center or apartment building occupied primarily by elderly persons and SSI recipients, and their spouses." 7 C.F.R. § 278.1(d) (emphasis added). The emphasized text makes clear that an entity can qualify as a meal service provider under § 278.1 only if it provides meals to households that are eligible to receive SNAP benefits under § 273.1. Thus, contrary to Stonebridge's submission, "household" eligibility under § 273.1 is a component of meal service provider eligibility under § 278.1, which in turn means that FNS appropriately considered § 273.1 in evaluating Stonebridge's application.

*Third*, Stonebridge challenges the factual premise of FNS's determination that it should not be authorized as a meal service provider under § 278.1 because its residents are ineligible to receive SNAP benefits. Doc. 19-1 at 8-9; Doc. 27 at 5. As just noted, under § 278.1, an applicant seeking certification as a SNAP meal service provider must "prepare and serve meals to households eligible to use coupons for those meals." 7 C.F.R. § 278.1(d). Stonebridge argues that it satisfies that requirement because "nearly all of [its] residents are SNAP beneficiaries," and because FNS has not directed the State of Illinois to withdraw those SNAP authorizations on the ground that its residents reside in an "institution" and thus are ineligible under 7 U.S.C. § 2021(m)(4) to receive SNAP benefits. Doc. 19-1 at 8-9 & n.9; Doc. 27 at 5. The United States responds that a facility's eligibility to participate in SNAP does not depend "on whether a state

11

might have improperly certified [its] resident[s] as … eligible household[s] or whether FNS has directed that state to withdraw such certifications." Doc. 24 at 10.

As the United States acknowledges, Doc. 24 at 9 n.3, the FNA delegates to the State of Illinois the "responsibility for certifying applicant households." 7 U.S.C. § 2020(a). And Stonebridge asserts in its brief that, at the time its application was pending with FNS, Illinois had certified nearly all its residents as SNAP-eligible households. Doc. 19-1 at 8-9. If that assertion is factually correct, and if the requirement in 7 C.F.R. § 278.1(d) that meal service providers serve meals to SNAP-eligible households is pegged to Illinois's determination of household eligibility—and it bears mention that the Secretary of Agriculture has not exercised his authority under 7 U.S.C. § 2020(g) to inform Illinois that he disagrees with its determination—then Stonebridge served meals to SNAP-eligible residents at the time its application was pending. That is important, for it appears that Stonebridge has satisfied the remaining requirements for being a meal service provider under 7 C.F.R. § 278.1(d): it "is a senior citizens' center or apartment building occupied primarily by elderly persons and SSI recipients, and their spouses," and the United States does not contend that it fails to comply with §§ 278.1(a) and (b).

The fly in the ointment is that the record does not back up Stonebridge's assertion in its brief that Stonebridge's residents were SNAP-eligible during the pendency of its application with FNS. Rather, the record shows only that, as of April 2021, "[n]early all" of Stonebridge's residents "*are* Medicaid and SNAP beneficiaries *or* have pending applications." Doc. 19-2 at ¶ 6 (emphasis added); *see also* Doc. 1 at ¶¶ 27-28 (alleging that, as of November 2020, "[a]pproximately 105 of Stonebridge's residents receive Medicaid benefits *or* have pending Medicaid applications," and that "[a]pproximately 104 of Stonebridge's residents are SNAP beneficiaries *or* have applied for SNAP benefits") (emphasis added). That gap in the record is

12

significant, for as Stonebridge admits, "[i]f none of [its] residents were SNAP authorized at th[e] time of its application, FNS might have had grounds to deny its application." Doc. 19-1 at 8 (emphasis omitted). And Stonebridge acknowledges in its Rule 56(d) motion that "discovery is necessary to confirm whether [its] residents were SNAP beneficiaries at the time that FNS denied its application for SNAP authorization." Doc. 21-1 at 4. The court therefore cannot conclude at this juncture that Stonebridge has made a "strong" showing that it is likely to succeed on the merits of its claim that FNS erred in denying its application on the ground that its residents were not eligible to receive SNAP benefits.

2. **The 2018 Farm Bill's Limitation Provision**

Stonebridge argues in the alternative that FNS's denial of its application violated the Limitation provision in the 2018 Farm Bill. Doc. 19-1 at 10-15; Doc. 27 at 6-8. As noted, the 2018 Farm Bill directs the Secretary of Agriculture to "review a representative sample of currently authorized facilities referred to in section 2012(k)(3) of this title"—*e.g.*, "senior citizens' centers[] [and] apartment buildings" that, like Stonebridge, are "occupied primarily" by elderly or disabled persons receiving certain Social Security benefits—to "gather information … [from] such facilities," to "report the results of [that] review[]," and to make recommendations to Congress about "whether such facilities … should continue to be authorized to participate" in SNAP. 7 U.S.C. §§ 2018(i)(1)(A), (C), (D). The Limitation provision, codified at § 2018(i)(2), adds that "[n]othing in" § 2018(i) "shall authorize the Secretary to deny any application for continued authorization, any application for authorization, or any request to withdraw the authorization of *any such facility* … based on a determination that residents of any *such facility* … are residents of an institution." *Id.* § 2018(i)(2) (emphasis added).

13

The parties dispute the meaning of the phrase "such facility" in § 2018(i)(2): Stonebridge contends that it encompasses *every* facility that satisfies § 2012(k)(3), while the United States contends that it refers only to "currently authorized [§ 2012(k)(3)] facilities"—the subjects of the review that § 2018(i)(1) directs the Secretary to undertake—meaning facilities that were authorized as of the 2018 Farm Bill's enactment on December 20, 2018. Doc. 19-1 at 11-14; Doc. 24 at 10-12; Doc. 27 at 6-8. Because FNS has never certified Stonebridge as a meal service provider, if the United States's interpretation of § 2018(i)(2) is right, then Stonebridge cannot benefit from the restraints that provision places on the Secretary.

At this juncture, the court preliminarily concludes that the United States's interpretation is correct. The word "such" in the term "such facility" in § 2018(i)(2) must have an antecedent. *See United States v. Gooding*, 25 U.S. 460, 477 (1827). That antecedent plainly appears in § 2018(i)(1)(A)—namely, the phrase "currently authorized facilities referred to in section 2012(k)(3)." Most naturally read, "such facility" encompasses the entire antecedent phrase, meaning only those § 2012(k)(3) facilities that are "currently authorized," rather than all § 2012(k)(3) facilities. *See Littlefield v. Mashpee Wampanoag Indian Tribe*, 951 F.3d 30, 37 (1st Cir. 2020) ("Normal usage in the English language would read the word 'such' as referring to the entire antecedent phrase."); *GE Co. v. Bucyrus-Erie Co.*, 550 F. Supp. 1037, 1042 n.7 (S.D.N.Y. 1982) ("[W]hen 'such' precedes a noun it is assumed to refer to a particular antecedent noun and any dependent adjective or adjectival clauses modifying that noun … ."). This conclusion finds support from the use of the phrase "such facilities" in § 2018(i)(1)(D), which in context refers only to "currently authorized" § 2012(k)(3) facilities, as § 2018(i)(1)(D) asks the Secretary to recommend "whether such facilities … should continue to be authorized to participate in the [SNAP] program." 7 U.S.C. § 2018(i)(1)(D)(ii). It would be unnatural to read "such facilities"

14

in § 2018(i)(2) to mean something different than the same phrase in § 2018(i)(1)(D)(ii). Accordingly, Stonebridge cannot benefit from whatever restrictions § 2018(i)(2) imposes on the Secretary.

### B. Irreparable Harm

An "applicant [for preliminary injunctive relief] must … demonstrate that 'irreparable injury is likely in the absence of an injunction.'" *Ill. Republican Party*, 973 F.3d at 763 (quoting *Winter*, 555 U.S. at 22). "[H]arm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044-45 (7th Cir. 2017) (internal quotation marks omitted). Stonebridge argues that it will suffer irreparable harm absent a preliminary injunction because: (1) it "is in dire financial circumstances and may need to cease operations" if FNS does not grant its application for SNAP authorization; and (2) it will be unable to recover the value of SNAP benefits that its residents would have redeemed since March 13, 2020, the date its application was denied, because the United States "does not appear to have waived its sovereign immunity with respect to claims for lost SNAP revenues," *see* 7 U.S.C. § 2023(a)(18). Doc. 19-1 at 15. Neither argument is persuasive.

Stonebridge's first contention—that preliminary injunctive relief is necessary due to its "dire" financial circumstances—is not backed by the record. The only evidence Stonebridge cites to support that contention is its executive director's averment that it "*may* need to cease operations" if it "does not receive its SNAP authorization in the near future." Doc. 19-2 at ¶ 13 (emphasis added). That allegation, without more, is insufficient to establish that irreparable harm is *likely*. As the Supreme Court has cautioned, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive

15

relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. In its reply brief, Stonebridge argues that its 2020 financial statements show that it is operating at a "net loss." Doc. 27 at 8-9. But Stonebridge does not attach its financial statements to its reply, so they cannot be considered for purposes of its motion. Accordingly, the court cannot conclude on the present record that Stonebridge's financial circumstances support a finding of irreparable harm.

As for the possibility that it may not be able to recoup lost SNAP reimbursements, Stonebridge's significant delay in seeking preliminary injunctive relief defeats its submission that it will suffer irreparable harm from that economic loss. Precedent holds that a lengthy, unexplained delay in seeking relief calls into question "how urgent the need for [preliminary] equitable relief really is." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). As described above, Stonebridge's approach to this litigation lacked urgency. Having waited over five months after filing suit to move for a preliminary injunction, Stonebridge cannot now assert—at least not persuasively—that it has an "urgent" need for preliminary injunctive relief to protect against the risk that it cannot recover SNAP revenue lost during the pendency of this case. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248-49 (11th Cir. 2016) (affirming the district court's ruling that the plaintiff failed to demonstrate irreparable harm given its unexplained five-month delay in seeking a preliminary injunction).

\* \* \*

In sum, on the present record, Stonebridge's preliminary injunction motion is denied because it fails to show either the requisite likelihood of success on the merits and or that the denial of relief will cause it to suffer irreparable harm. *See Cassell v. Snyders*, 990 F.3d 539, 551-54 (7th Cir. 2021) (affirming the denial of a preliminary injunction on certain claims

because the plaintiffs "failed to show a likelihood of success" on those claims); *Ill. Republican Party*, 973 F.3d at 762-71 (affirming the denial of a preliminary injunction because the plaintiffs were unlikely to succeed on the merits); *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 475-78 (7th Cir. 2001) (affirming the denial of a preliminary injunction because the plaintiff "had a less than promising prospect of success on the merits," and in the alternative because "there was no irreparable injury"); *Graham*, 130 F.3d at 294 (affirming the denial of a preliminary injunction because the plaintiff "ha[d] not demonstrated that [she] will suffer irreparable harm by the denial of this injunction") (internal quotation marks omitted).

## II. United States's Motion to Dismiss or for Summary Judgment

The United States seeks dismissal, or summary judgment, on the ground that Stonebridge will be unable to demonstrate that FNS's denial of its application was wrong. Stonebridge moves under Rule 56(d) to postpone decision on the United States' motion so that it can take discovery. Doc. 21. Rule 56(d) provides that, after a party moves for summary judgment:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "A party seeking relief under Rule 56(d) must show by affidavit or declaration specific reasons discovery should be extended, which requires more than a fond hope that more fishing might net some good evidence." *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019). "[S]ound reasons for denying a properly supported Rule 56(d) motion most often are either (1) the moving party's failure to pursue discovery diligently before the summary judgment motion, or (2) the apparent futility of the requested discovery." *Id*. at 866.

To support its Rule 56(d) motion, Stonebridge submits an affidavit from its counsel asserting, among other things, that it should "be permitted to undertake limited discovery at this time because it could not do so during FNS SNAP administrative proceedings." Doc. 21-3 at ¶ 4. Stonebridge identifies three topics on which it needs discovery in order to oppose summary judgment: (1) "whether Stonebridge's residents were and are SNAP beneficiaries at all times relevant hereto, and, if so, why they are still SNAP beneficiaries in light of FNS's determination that Stonebridge is an institution," Doc. 21-1 at 4; (2) "Stonebridge's and other applications for SNAP authorization submitted by apartment buildings primarily occupied by the elderly and disabled," Doc. 21-3 at ¶¶ 10-11; and (3) "FNS's regulations, guidance, memoranda, other issuances, and interpretation" of 7 U.S.C. §§ 2018(i)(1) and (2) and the terms "institution," "food," "retail food store," "meal service providers," "residential buildings," and "household concept," *ibid*. The United States responds that the requested discovery would not assist Stonebridge in opposing summary judgment because such discovery does not implicate "disputed issues of material fact." Doc. 25 at 4-9.

The United States is correct as to Stonebridge's third proposed discovery topic. Because the proper construction of the pertinent terms and provisions of the FNA and its implementing regulations present legal rather than factual questions, *see CFTC v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 549 (7th Cir. 2013), Stonebridge has not met its "burden to identify material *facts* needed" to justify that discovery, *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 628 (7th Cir. 2014) (emphasis added). *See Hillshire Brands Co. v. Travelers Cas. & Sur. Co.*, 2016 WL 6892885, at *2 (N.D. Ill. Nov. 23, 2016) ("[T]he Court should deny the Rule 56(d) motion only

18

if the issues at stake are purely legal such that no facts could make a difference in the outcome of the case.").

By contrast, Stonebridge has demonstrated a need for discovery on the first and second topics. As explained, whether Stonebridge's residents were authorized SNAP recipients during the pendency of Stonebridge's FNS application may be central to the question whether it was an eligible meal service provider under 7 C.F.R. § 278.1(d). Moreover, facts pertaining to successful applications for SNAP authorization submitted by comparable facilities are relevant to Stonebridge's claim that "FNS acted arbitrarily and capriciously in denying [its] application for SNAP authorization while, at the same time, determining that at least two other Illinois SLPs are eligible for SNAP authorization, despite possession of evidence that both SLPs serve a majority of meals to their residents." Doc. 1 at ¶ 67. Discovery on those topics would not be "futile," so Stonebridge's Rule 56(d) motion is granted as to them. *Smith*, 933 F.3d at 866.

## Conclusion

Stonebridge's motion for a preliminary injunction is denied, and its Rule 56(d) motion is granted to the extent set forth above. Because the discovery sought by Stonebridge may allow it to defeat the United States's motion to dismiss or for summary judgment, that motion is denied.

December 22, 2021

_____
United States District Judge